# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Alexander L. Hunsberger, Petitioner.

Appellate Case No. 2015-000083

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Edgefield County
Clifton Newman, Circuit Court Judge

---

Opinion No. 27671
Heard December 2, 2015 – Filed October 12, 2016

---

## REVERSED

---

Appellate Defender Susan Barber Hackett, of Columbia,
for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General John W. McIntosh, Senior Assistant
Deputy Attorney General Donald J. Zelenka, Senior
Assistant Attorney General Melody Jane Brown, all of
Columbia, and Solicitor Donald V. Myers, of Lexington,
all for Respondent.

**CHIEF JUSTICE PLEICONES:** Petitioner Alexander L. Hunsberger (Alex) was sentenced to thirty-three years' incarceration for his part in the murder of Samuel Sturrup. Alex argued on appeal that the trial judge erred in denying his speedy trial motion. The Court of Appeals affirmed. *State v. Hunsberger*, Op. No. 2014-UP-381 (S.C. Ct. App. filed Nov. 5, 2014). We granted Alex's petition for a writ of certiorari to review the Court of Appeals' decision, and now reverse.

The acts that led to Alex's prosecution for murder are heinous. Sturrup allegedly stole money from Steven Barnes,[1] the purported head of a robbery and prostitution ring in Georgia. In an effort to force Sturrup to divulge where the stolen money was located, Barnes allegedly beat, and caused others to beat, Sturrup at a location in Augusta, Georgia. Sturrup was then placed in the trunk of a vehicle and brought from Georgia to South Carolina by Alex and his brother Julio Hunsberger.[2] Sturrup was taken into a field and shot by several individuals including the Hunsberger brothers. Barnes is alleged to have fired the fatal shot.

In January 2002, Alex was arrested in South Carolina and in March 2002, he was indicted for the murder of Sturrup. In June 2002, Alex's request for bail was denied and his renewed request was denied in April 2004. In November 2004, Alex moved for an order requiring the State to try him during the next two terms of court, or if no trial were held, that he be released on bail, citing S.C. Code Ann. § 17-23-90 (2014)[3] and the state and federal constitutional guarantees of due process and speedy trial. While this motion was denied in December 2004, the circuit court judge found the delay "clearly bordering on the excessive" and admonished

---

[1] Steven Barnes' capital conviction was reversed on direct appeal. *State v. Barnes*, 407 S.C. 27, 753 S.E.2d 545 (2014).

[2] Julio's conviction is also being set aside on speedy trial grounds in an opinion filed today. *State v. Hunsberger*, Op No. 2016-MO-029(S.C. Sup. Ct. filed October 12, 2016).

[3] This statute is derived from Section 7 of the Habeas Corpus Act of 1679. *See* 1 Statutes at Large 117, 119-120. Section 17-23-90 provides that, upon demand, a prisoner who is not indicted or tried by the second term following the demand be released without bail. *E.g.*, *State v. Campbell*, 277 S.C. 408, 288 S.E.2d 395 (1982).

the State to either try Alex or release him to Georgia which had placed a hold on him.

In an effort to resolve the case, Judge Keesley offered to seek a special February 2005 term of court to allow the State to try Alex then, but the solicitor declined. Following notification that the State would not go forward with Alex's trial, in January 2005 Judge Keesley granted Alex bail but ordered him held unless Georgia released its hold. Alex was subsequently extradited to Georgia, and in September 2006, he was convicted there of kidnapping with bodily injury of Sturrup, and sentenced to life imprisonment. While imprisoned in Georgia, Alex repeatedly declined to be a witness against Steven Barnes in Barnes' South Carolina death penalty case. Barnes was tried and convicted in November 2010.

In early 2011, Alex was extradited to South Carolina. In January 2012, the State called Alex's case for trial and Alex moved for dismissal of his charges, claiming his state and federal rights to a speedy trial had been violated. The motion was denied, as was his renewed request made at mid-trial.

## ISSUE

> Did the Court of Appeals err in affirming the trial court's denial of Alex's motion to dismiss his charges under both the United States and South Carolina Constitutions due to a violation of his right to a speedy trial?

## ANALYSIS

Alex argues that his right to a speedy trial under both the United States and South Carolina Constitutions was violated, and therefore, his murder charge should be dismissed. We analyze the issue under the Sixth Amendment, and agree.

The Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Similarly, the South Carolina Constitution provides that "Any person charged with an offense shall enjoy the right to a speedy and public trial." S.C. Const. art. I, § 14. A speedy trial means a trial without unreasonable and unnecessary delay. *State v. Langford*, 400 S.C. 421, 441, 735 S.E.2d 471, 482 (2012) (quoting *Wheeler v. State*, 247 S.C. 393, 400, 147 S.E.2d 627, 630 (1966)).

The remedy for a speedy trial violation is dismissal of the charges. *Langford*, 400 S.C. at 442, 735 S.E.2d at 482 (internal citation omitted). The trial court's ruling on a motion for speedy trial is reviewed under an abuse of discretion standard. *Id.* at 442, 735 S.E.2d at 482 (internal citation omitted). An abuse of discretion occurs when the court's decision is based on an error of law or upon factual findings that are without evidentiary support. *Id.* at 442, 735 S.E.2d at 482 (internal citation omitted).

An accused's speedy trial right begins when he is "indicted, arrested, or otherwise officially accused." *Langford*, 400 S.C. at 442, 735 S.E.2d at 482 (citing *United States v. MacDonald*, 456 U.S. 1, 6 (1982)). To trigger a speedy trial analysis, the accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. *Doggett v. U.S.*, 505 U.S. 647, 652 (1992). Presumptively prejudicial delay exists when an accused is not prosecuted with ordinary promptness. *See Doggett*, 505 U.S. at 651-52 (1992). Once the accused has met this initial burden, a court must look to four factors, among the totality of the circumstances, to decide whether the defendant's right to a speedy trial has been denied. *Barker v. Wingo*, 407 U.S. 514, 530-31 (1972); *see also Langford*, 400 S.C. at 441, 735 S.E.2d at 482. These factors are: (1) length of delay; (2) the reason for the delay; (3) the accused's assertion of his right to a speedy trial; and (4) whether the delay prejudiced the accused. *Barker* at 531-32. A speedy trial claim must be "analyzed in terms of the circumstances of each case, balancing the conduct of the prosecution and the defense." *State v. Pittman*, 373 S.C. 527, 549, 647 S.E.2d 144, 155 (2008) (citing *Barker*, 407 U.S. at 530).

Because the timeline is essential to determining whether Alex was denied a speedy trial, the important dates are outlined below:

- January 25, 2002: Arrest.

- March 2002: Indictment

- November 17, 2004: Alex makes first Speedy Trial motion.

- December 2, 2004: Judge Keesley declines to release Alex on bail but admonishes the State to be prepared to try Alex in February 2005 unless the solicitor notifies the court he will allow Georgia to take custody. Court order acknowledges problems arising from multiple defendants and different jurisdictions in addition to the possibility that South Carolina will seek the death penalty against Alex. Judge Keesley then writes: "However, Georgia has disposed of the cases involving the co-defendants over a year ago, and the court has instructed the Solicitor's office on at least two prior occasions that it must make a decision about whether to serve the death penalty notice."

- January 28, 2005: The State declines Judge Keesley's offer to try Alex during a special February 2005 term of Court; Judge Keesley grants Alex bail, subject to hold placed on him by Georgia.

- Early 2005: Alex is extradited to Georgia.

- September 12, 2006: Alex is convicted in Georgia of kidnapping Sturrup with bodily injury and sentenced to life imprisonment. Alex appeals.

- November 2010: Barnes is convicted and sentenced to death in South Carolina.

- September 2011: Alex is made aware South Carolina is seeking his extradition.

- October 2011: Alex is extradited to South Carolina.

- January 3, 2012: Alex's murder case is called in South Carolina, and he makes a motion for dismissal based on the denial of his right to a speedy trial. He renews this motion after the State rests.

In this case appellate review of the trial court's ruling is complicated by the court's failure to make specific findings, relying instead on general statements about the

complexity of the cases, problems involving multiple jurisdictions, and Alex's failure to show actual prejudice.[4]

## A. Triggering Factor and Length of Delay

The Court of Appeals held that the three-year period between Alex's arrest in 2002, and his release to Georgia in 2005, was sufficient to trigger the speedy trial analysis. *State v. Hunsberger*, Op. No. 2014-UP-381 (S.C. Ct. App. filed Nov. 5, 2014). We agree.

The Court of Appeals held that the three-year period between Alex's arrest[5] and extradition to Georgia from South Carolina was sufficient to trigger further review.[6] Alex argues that using three years instead of ten years is an error of law that affects the entire Court of Appeals' analysis. We hold, whether three years or ten years, the delay between Alex's arrest and trial meets the threshold requirement for a speedy trial claim, and requires an analysis of the four *Barker* factors. *See*

---

[4] We note our concern that both the trial court and the Court of Appeals seem to find an absence of prejudice since Alex "was not deprived of his liberty because he was incarcerated in Georgia under another sentence." The dissent echoes this sentiment when it makes a factual finding that Alex's "pretrial incarceration and anxiety concerns were minimal." We have searched the record for any evidence to support this statement, and have found none. Both of the lower tribunals ignored the Supreme Court's decision in *Smith v. Hooey*, 393 U.S. 374 (1969), and the dissent purportedly distinguishes it by citing to an unpublished federal district court opinion, which held that incarceration in one jurisdiction does not lessen the accused's constitutional right to a speedy trial on charges pending in another jurisdiction, noting "an outstanding untried charge . . . can have fully as depressive an effect upon a prisoner as upon a person who is at large." *Id.* at 378. *See also Betterman v. Montana*, 578 U.S. ____ (2016) fn. 5 (confirming *Smith's* holding).

[5] The time period for speedy trial analysis begins with "formal accusation," which can be earlier than an accused's arrest. *Langford*, 400 S.C. at 442, 735 S.E.2d at 482 (internal citation omitted). Alex uses his arrest as the date his speedy trial right attached, and we do so as well.

[6] The trial judge never explicitly stated that the delay here was sufficient to trigger the speedy trial analysis but instead proceeded to immediately analyze the question of prejudice.

*Langford*, 400 S.C. at 442-443, 735 S.E.2d at 482 (holding a twenty-three month delay was presumptively prejudicial) (internal citation omitted); *State v. Cooper*, 386 S.C. 210, 687 S.E.2d 62 (Ct. App. 2009) (reaching the *Barker* factors when there was a forty-four month delay); *State v. Waites*, 270 S.C. 104, 240 S.E.2d 651 (1978) (holding a twenty-eight month delay triggered speedy trial analysis). Having found that Alex satisfied the threshold standard, we turn now to a review of the four *Barker* factors we consider when analyzing a speedy trial claim: (1) length of delay; (2) reason for the delay; (3) defendant's assertion of his speedy trial right; and (4) prejudice to the defendant from the delay. *See State v. Reaves*, 414 S.C. 118, 777 S.E.2d 213 (2015).

We agree with the trial judge and with the Court of Appeals that the full ten-year delay between Alex's South Carolina arrest in 2002, and his South Carolina trial in 2012, is not entirely attributable to the State. *See Langford*, 400 S.C. at 443, 735 S.E.2d at 483 (holding that delays occasioned by the defendant weigh against him). The State should not bear responsibility for the time that Alex was awaiting trial in Georgia, for when a defendant violates the laws of multiple sovereigns, one jurisdiction must necessarily wait at the "prosecutorial turnstile." *See U.S. v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998). Therefore, we hold the time from the January 28, 2005 order requiring Alex's extradition to Georgia or his release on bail, until his Georgia conviction on September 12, 2006, should not be counted against the State. This reduces the ten-year period by approximately one year and seven months.

It appears from the record that Alex did not affirmatively consent to extradition to South Carolina in 2011, and therefore delayed his trial by four months. The State argues Alex contested extradition by refusing to consent, although Alex testified that after being presented with the extradition form in September 2011 he sought advice from an attorney on the effect his consent would have on his pending Georgia appeal. For purposes of our analysis, we weigh the four-month delay in the extradition proceedings slightly against Alex. Therefore, with the delay from Alex's Georgia proceedings and the extradition deducted from the total, the State is responsible for an eight-year delay between arrest and trial. This extraordinary delay, during which time Alex was continuously in custody and for the most part available for trial in South Carolina, weighs heavily against the State.

We turn next to the reasons given by the State for the delay.

**B. Reasons for Delay**

The State's justifications for delay in trying a defendant are weighted differently: (1) a deliberate attempt to delay trial as a means to hamper the defense weighs heavily against the State; (2) negligence or overcrowded dockets weigh less heavily against the State, but are ultimately its responsibility; (3) a valid reason, such as a missing witness, justifies an appropriate delay; and (4) delays occasioned by the accused weigh against him. *Langford*, 400 S.C. at 443, 735 S.E.2d at 483 (internal citation omitted). Ultimately, justifying the delay between charge and trial is the responsibility of the State. *Langford*, 400 S.C. at 443, 735 S.E.2d at 483 (internal citation omitted).

The trial court held the State gave legitimate reasons for the delay, pointing to the complexity of the cases and the problems involved in cross border prosecutions. The Court of Appeals did not specifically address the reasons for the State's delay, but held that under the totality of the circumstances, the trial court did not abuse its discretion. *State v. Hunsberger*, Op. No. 2014-UP-381 (S.C. Ct. App. filed Nov. 5, 2014). We find the reliance on complexity and cross border issues patently insufficient in this case in light of the findings of Judge Keesley in his December 2004 order.

To the extent the Court of Appeals upheld the trial court's ruling on the basis of "complexity," it erred. There is no evidence that Alex's case, while serious, was complex. *See Langford,* 400 S.C. at 442, 735 S.E.2d at 482 (making the distinction between complex and serious crimes). Three individuals (other than Barnes and the Hunsberger brothers) were codefendants in the Georgia and South Carolina cases involving the beating of Sturrup in Georgia and his murder in South Carolina. These three eyewitnesses, who all testified against Alex in this January 2012 trial, had pleaded guilty in Georgia by December 2003. From at least that time forward, all three were available to law enforcement in South Carolina, and available to testify against Alex in South Carolina. No new evidence was sought or discovered during the almost nine-year delay between their Georgia pleas and Alex's South Carolina trial. This was not a complicated conspiracy that required years to unravel, instead, all of the evidence used to prosecute Alex for Sturrup's murder was known at the time of or shortly after Alex's arrest. The lower courts erred in agreeing with the State that the "complexity" of Alex's case justified the delay.

The second reason the trial court found justified the delay in Alex's South Carolina trial was "the problems involved in cross-border prosecutions." Again, we find no evidence in the record to support this finding. The State had the opportunity to bring Alex to trial for three years before he was extradited to Georgia. Moreover, the State waited another five years after Alex was convicted in Georgia to begin extradition proceedings. Excepting the year and eight months that Georgia took to try Alex's case, and the four months delay caused by Alex (allegedly) contesting extradition, the record does not demonstrate that "cross-border" issues had any bearing on the State's delay. We find no evidence that the issues resulting from Alex's prosecution in Georgia justified the lengthy delay of his South Carolina trial.

The State now argues, and we agree, that "collecting" witnesses can be a legitimate reason for delay. The State, however, neither presented evidence that it was looking for additional witnesses in Alex's case nor did the trial judge make such a finding. The State seeks to distort this otherwise legitimate reason by applying it not to a witness, but instead to the defendant. Alex was neither a "missing witness" nor a witness that needed "collecting." Instead, he was at all times a prisoner in either South Carolina or Georgia. The State admitted it delayed trying Alex in hopes he would agree to be a witness against Barnes in Barnes' South Carolina's capital trial, which itself did not take place until approximately nine years after Sturrup's skeletal remains were found in a South Carolina field. The State's characterization of Alex as a witness needing to be "collected," or "missing" suggests its true reason for delay was its hope that Alex would be coerced by the delay in his trial into testifying against Barnes. *See Barker*, 407 U.S. at 531 n.32 (indicating it is improper for the prosecution to intentionally delay to gain a tactical advantage over a defendant (internal citation omitted)). The State's desire to have Alex testify against Barnes in South Carolina did not, under the circumstances present here, justify the delay in Alex's trial. Further, that the State placed a higher priority on strengthening its case against Barnes than on bringing Alex's case to trial cannot, alone, justify the delay of Alex's trial. The purpose of the right to a speedy trial is to vindicate a defendant's and society's interest in a speedy resolution of cases. *Barker* at 519. This purpose is not served when the constitutional right of a low priority defendant is sacrificed in hopes that defendant will help the State in a higher priority trial. *Cf.*, *Doggett*, 505 U.S. at 657 (holding that condoning unjustifiable delays would encourage the government to gamble with the interests of those assigned a low prosecutorial priority). The State's desire to present the strongest case against Barnes, especially when the three other

eyewitnesses who had pled guilty to the Georgia charges in 2003 were available and willing to testify against him, does not justify the delay in prosecuting Alex's case.

Finally, there is simply no evidence that the delay was the result of the State's decision-making process whether to seek the death penalty against Alex. The State does not assign a specific amount of delay to this decision, nor does it explain why this capital decision took such an especially long time. Further, this purported reason is undermined by Judge Keesley's order issued in early December 2004, in which he wrote he had already "instructed the Solicitor's Office on at least two prior occasions that it must make a decision about whether to serve the death penalty notice [on Alex]." While the decision to seek the death penalty must be weighed carefully by the State, here all facts necessary to such a decision were known to it well before December 2004. There is simply no evidence that the State was actually debating the capital decision during the period between December 2004 and Alex's trial in January 2012.

The justifications advanced by the State for its delay are unsupported by the evidence, which in turn suggests that the State was using this murder charge as leverage to coerce Alex's testimony in Barnes' capital trial. The reasons for the delay is a factor that weighs heavily against the State.

## C. Accused's Assertion of the Right to a Speedy Trial

Whether a defendant previously asserted the right to a speedy trial is not alone dispositive of whether he is entitled to relief. *See Barker*, 407 U.S. at 533 (holding none of the four factors are either necessary or sufficient to find a denial of the right to a speedy trial). The accused's assertion of the right, however, is entitled strong evidentiary weight in determining whether the accused is being deprived of the right. *Barker*, 407 U.S. at 531-32. Failure by the accused to assert the right will make it more difficult for the accused to carry his burden of proving that he was denied a speedy trial. *Id.* at 532.

The trial court did not specifically address Alex's assertions of his right to speedy trial, other than to note it had been almost five years since Alex was tried in Georgia. The Court of Appeals noted that Alex asserted his right three times.

It is undisputed that Alex moved for a speedy trial in November 2004 and twice during January 2012. While the State argues that it is significant that Alex did not move for a speedy trial between January 2005 and January 2012, we hold that under the circumstances of this case, including the fact that Alex's appeal from his 2006 Georgia conviction was still unresolved when the State sought extradition in 2011, his failure to press his right during this period is understandable. While Alex's assertion of his right to a speedy trial three times was sufficient to demonstrate Alex's desire for a speedy resolution of his charges, we find his seven-year silence renders this factor largely neutral in our overall evaluation.

## D. Prejudice to the Accused

The trial court held:

> the only way that prejudice can be determined in an instance like this is based on something you demonstrated if there's a trial. . . . prejudice [cannot] be assumed given the facts I have heard. . . . Who knows what may develop during the course of the trial. We may get some indication that the defendant's due process rights have been violated or right to a fair trial has been violated. Due to the length of time involved, but I believe that the— based on what I've heard the State has shown that it has acted properly under the circumstances and that the defendant has not shown any prejudice that might affect his right to a fair trial or his due process rights.

After the State presented its case, Alex renewed his motion for dismissal. In making this midtrial motion, Alex pointed out specific discrepancies in the testimony of two of the three eyewitnesses between their earlier statements or testimony at earlier proceedings.[7] The trial court again denied the motion, stating Alex had not been prejudiced because the memories of the witnesses were "pretty vivid." The Court of Appeals held the trial court did not abuse its discretion in finding Alex did not demonstrate prejudice from the trial delay, speculating that Alex may have received a benefit from the delay because the State no longer sought the death penalty. *State v. Hunsberger*, Op. No. 2014-UP-381 (S.C. Ct.

---

[7] Most importantly, whether one or both of the Hunsberger brothers exited their car with a gun, and who was outside the car when Sturrup was forced in the Hunsbergers' car's trunk.

App. filed Nov. 5, 2014).  We agree with Alex that these prejudice rulings are erroneous.

First, we note that the trial court's ruling was influenced by an error of law in so much as it rested on a belief that actual prejudice —to the exclusion of presumptive prejudice —was the only type of prejudice that would support a speedy trial claim.   In fact, an accused can assert actual prejudice or presumptive prejudice as the result of the State's violation of his right to a speedy trial.  Actual prejudice occurs when the trial delay has weakened the accused's ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. *See Doggett*, 505 U.S. at 655 (accepting the State's definition of actual prejudice). The United States Supreme Court also recognized that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or even identify.  *Id* (internal citation omitted).  This is so because "time's erosion of exculpatory evidence and testimony 'can rarely be shown.'"  *Doggett*, 505 U.S. at 655 (citing *Barker*, 407 U.S. at 532).  When the government persistently fails to try an accused and the delay is excessive, the accused need not show actual prejudice in order to prevail in his speedy trial claim.  *Doggett,* 505 U.S. at 657-58.  While presumptive prejudice cannot alone support a speedy trial claim, it is part of the mix of relevant facts, and its importance increases with the length of time.  *Doggett*, 505 U.S. at 656 (internal citation omitted).

We hold the Court of Appeals erred in affirming the trial court's failure to consider presumptive prejudice.  As the United States Supreme Court held, "When the Government's negligence . . . causes delay six times as long as that generally sufficient to trigger judicial review . . . and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief."  *Doggett*, 505 U.S. at 658 (holding an accused's right to a speedy trial was violated when his trial was delayed eight years with no showing of actual prejudice); *see also U.S. v. Ingram*, 446 F.3d 1332, 1340 (11th Cir. 2006) (holding that a two-year delay from indictment to trial resulted in a speedy trial violation when the first three factors weighed against the State and there was no actual prejudice).  While not every lengthy delay results in presumptive prejudice, *see State v. Evans*, 386 S.C. 418, 688 S.E.2d 583 (2009) (holding a twelve year delay did not violate the right to speedy trial), on this record it appears the State's delay was not merely negligent but intentional.  Further, there was some evidence of actual prejudice in the

discrepancies in the eyewitnesses' testimony.  We hold that Alex met his burden of demonstrating prejudice.

## CONCLUSION

After considering the totality of the circumstances, we hold that the Court of Appeals erred in affirming the trial court's ruling that Alex's right to a speedy trial was not violated and therefore the Court of Appeals' decision is

**REVERSED**.


**BEATTY and HEARN, JJ., concur.  Acting Justice Jean H. Toal, dissenting in a separate opinion in which KITTREDGE, J., concurs.**

**ACTING JUSTICE TOAL:**  I respectfully dissent.  Because I would affirm the court of appeals' decision finding that the trial court did not abuse its discretion in refusing to dismiss the murder charge against Alexander Hunsberger (Petitioner) on the basis of the State's failure to provide a speedy trial, I would dismiss the writ of certiorari as improvidently granted.

### I. Facts and Procedural Background

On September 3, 2001, Samuel Sturrup (the victim) was murdered.  The State alleged Steven Barnes, Richard Cave, Antonio Griffin, and Charlene Thatcher began an assault on the victim in Georgia because Barnes believed the victim had stolen money from him.  Barnes called Petitioner and Julio, who drove from South Carolina to Augusta, where the group placed the victim in the trunk of Julio's car.  Barnes, Cave, Griffin, and Thatcher followed Petitioner and Julio in another car to a remote area of Edgefield County, South Carolina.  When they arrived, Barnes ordered everyone in the group to shoot the victim, and Barnes fired the fatal shot into the back of the victim's head.

On January 25, 2002, Petitioner was arrested in South Carolina for the murder of the victim and was held without bond.  On March 25, 2002, a grand jury indicted Petitioner for murder.  On June 14, 2002, Petitioner was denied bail.  Another bond hearing was held on April 29, 2004, before the Honorable William P. Keesley.  While Judge Keesley denied bail, he provided that Petitioner could renew his motion if the State failed to try Petitioner during the next term of court.  On November 17, 2004, Petitioner filed a motion to dismiss the charges against him or release him on a personal recognizance bond based upon the State's failure to give him a speedy trial, denial of due process, unreasonable confinement without bail, and violation of S.C. Code Ann. § 17-23-90.[8]  Judge Keesley heard arguments on the motion in December 2004, and by order filed December 3, 2004, Judge Keesley denied the motions.  However, Judge Keesley expressed "deep[] concern[] about the length of time that ha[d] transpired without bringing [Petitioner] to trial" and noted that "[t]hree years in jail awaiting trial on this charge [was] clearly bordering on excessive."  Judge Keesley further offered to create a special term of court for the purpose of proceeding with Petitioner's trial in

---

[8] *See* S.C. Code Ann. § 17-23-90 (2014) (providing for bail and release from imprisonment should the State fail to prosecute a defendant within a certain time frame).

February 2005, and in his order, permitted Petitioner to renew his motion if he had not been tried by February 2005. The Court "again admonished [the State] that unless immediate steps [were] taken to bring this case to trial promptly, the court [would] have no option under the constitutions of the United States and South Carolina except to release the defendant from jail in South Carolina."

The State subsequently notified Judge Keesley that it did not intend to try the case in February, and Petitioner filed a second speedy trial motion. On January 28, 2005, Judge Keesley issued an order denying Petitioner's motion to dismiss the charges, but granted Petitioner a $50,000 personal recognizance bond. However, Judge Keesley placed a condition on the bond that Petitioner was not to be released from custody until Georgia released its hold on Petitioner. Judge Keesley also invited Georgia officials to begin extradition proceedings. Thereafter, the State relinquished custody of Petitioner to Georgia. Petitioner and Julio were jointly tried in Georgia and were convicted of kidnapping in September 2006. They were sentenced to life imprisonment.

After the State obtained a death penalty conviction in Barnes's case in November 2010, the State sought to extradite Petitioner to South Carolina in early 2011. It is unclear when exactly Petitioner was extradited to South Carolina; however, Petitioner proceeded to trial on January 3, 2012. During pre-trial motions, Petitioner sought to have his South Carolina charges dismissed because the State had violated his constitutional right to a speedy trial. The trial court denied the motion, and Petitioner appealed. The court of appeals affirmed. *See State v. Alexander L. Hunsberger*, Op. No. 2014-UP-381 (S.C. Ct. App. filed Nov. 5, 2014). We granted certiorari to consider Petitioner's claim that he was denied his constitutional right to a speedy trial.

### II. Analysis

"In all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI; *see also* S.C. Const. art. I, § 14 ("Any person charged with an offense shall enjoy the right to a speedy . . . trial."). The right has been described as "necessarily relative," in that "[i]t is consistent with delays and depends upon circumstances." *State v. Langford*, 400 S.C. 421, 441, 735 S.E.2d 471, 481 (2012) (quoting *Beavers v. Haubert*, 198 U.S. 77 (1905)). In other words, "[a] speedy trial does not mean an immediate one; it does not imply undue haste, for the [S]tate, too, is entitled to a reasonable time in which to prepare its case; it simply means a trial without unreasonable and unnecessary delay." *Id.* at 441, 735

S.E.2d at 481–82 (quoting *Wheeler v. State*, 247 S.C. 393, 400, 147 S.E.2d 627, 630 (1966)).

Even though the United States Supreme Court has provided that speedy trial issues should be resolved on an ad hoc basis, the Court has identified several factors to be considered when deciding speedy trial issues, including: (1) the length of the delay; (2) the reason(s) the government provides to justify the delay; (3) the timing of the defendant's assertion of his right to speedy trial; and (4) the prejudice resulting to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *see also State v. Foster*, 260 S.C. 511, 197 S.E.2d 280 (1973) (recognizing *Barker* factors as applicable under South Carolina law). The Supreme Court has explained that not one of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. Rather, the factors are interrelated and "must be considered along 'with such other circumstances as may be relevant.'" *Langford*, 400 S.C. at 441, 735 S.E.2d at 482 (quoting *Barker*, 407 U.S. at 533). Thus, courts should weigh "'the conduct of both the prosecution and the defense.'" *Id.* at 441–42, 735 S.E.2d at 482 (quoting *Barker*, 407 U.S. at 529–30).

The "triggering mechanism" of the *Barker* analysis is the length of the delay. *Id.* at 442, 735 S.E.2d at 482 (citing *Barker*, 407 U.S. at 530). When a defendant asserts his speedy trial right, the court "should not even examine the remaining factors '[u]ntil there is some delay which is presumptively prejudicial.'" *Id.* (quoting *Barker*, 407 U.S. at 530). "The clock starts running on a defendant's speedy trial right when he is 'indicted, arrested, or otherwise officially accused,' and therefore we are to include the time between arrest and indictment." *Id.* (quoting *United States v. MacDonald,* 456 U.S. 1, 6 (1982)). Notably, however, "even the length of time necessary to trigger the full inquiry 'is necessarily dependent upon the peculiar circumstances of the case.'" *Id.* (quoting *Barker*, 407 U.S. at 530–31). Further, the Supreme Court has explained that "as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Doggett v. United States*, 505 U.S. 647, 652, n.1 (1992).

### A. Triggering Factor and Length of Delay

I agree with the majority and the court of appeals that Petitioner's incarceration South Carolina from January 2002 until January 2005 is presumptively prejudicial and therefore triggers further analysis into the causes of the delay using the *Barker* factors. *See id.*; *State v. Waites*, 270 S.C. 104, 108, 240 S.E.2d 651, 653 (1978) (finding a two year, four month delay was sufficient to trigger further review of the *Barker* factors). I also agree with the majority's analysis of the length of time factor within the context of the *Barker* inquiry. Under the majority's formulation, the State is responsible for an eight-year delay in prosecuting Petitioner. I disagree, however, with how the majority analyzed the delay within the context of the remaining *Barker* factors.

### B. Reason for Delay

In assessing this element, this Court has interpreted *Barker* as follows:

> The ultimate responsibility for the trial of a criminal defendant rests with the State. *Barker*, 407 U.S. at 531. Therefore, the court should weigh heavily against the State any intentional delays to impede the defense. *Id.* Where the reason for the delay is more neutral, the court should weigh it less heavily against the State. *Id.* A valid reason presented by the State may justify an appropriate delay. *Id.* However, the Court must also consider and weigh the defendant's contribution to the delay in determining whether the defendant's Sixth Amendment rights have been violated. *Waites*, 270 S.C. at 108, 240 S.E.2d at 653 (holding defendant's contribution to the delay of the trial militated against a finding of a violation of the right to a speedy trial).

*State v. Pittman*, 373 S.C. 527, 549, 647 S.E.2d 144, 155 (2007).

As noted by the majority, the State has provided the following reasons for the delay: (1) the complexity of the case; (2) the fact that there were two separate jurisdictions endeavoring to prosecute Petitioner; (3) the need to collect witnesses; and (4) the decision to seek the death penalty in Petitioner's case. The majority finds that this was a simple crime, and therefore, to the extent the court of appeals found it to be complex, the court of appeals erred. In my opinion, this case was

unique in that it required a great deal of coordination within the Solicitor's office and amongst the jurisdictions to pursue these prosecutions. As astutely explained by the trial judge:

> It's a rather unique case for a lot of reasons. It's unique in the sense that you have cross-border issues, you have Georgia wanting to pursue Georgia's case, but South Carolina wanting to pursue South Carolina's cases, each defendant asserting their individual constitutional rights and the State having a capital case that [it is] wanting to pursue and [has] successfully pursued. So this case doesn't follow the normal framework of cases where a person is—has a charge outstanding and simply wants to get it tried, wants to get it over with. This is a case that has a number of complicated factors that bring us to this moment in time.

The trial judge found that the State had "demonstrated legitimate reasons for the delay given the complex nature of the cases, [and] the problems involving prosecutions in multiple jurisdictions in this state as well as the State of Georgia."

In my opinion, the trial court did not abuse its discretion in finding the State presented legitimate reason for the delay. *See, e.g.*, *State v. Kennedy*, 339 S.C. 243, 250, 528 S.E.2d 700, 704 (Ct. App. 2000) ("While Kennedy asserted his right to a speedy trial fourteen months prior to the commencement of his trial, the case was clearly complicated and required substantial time to investigate and prepare. Further, there is an absence of evidence in this case that the State purposefully delayed Kennedy's trial. Finally, we conclude the prejudice to Kennedy, if any, is minimal."). Here, the State was dealing with the potential for six separate prosecutions (one of which involved the State seeking the death penalty and two that involved the possibility of the death penalty); the various defendants were asked to be witnesses in the other cases; and the crime occurred in two states, both of which were seeking to prosecute the defendants.[9] In light of these unique facts,

---

[9] Ultimately, the Hunsbergers and Barnes were released to Georgia to stand trial prior to their trials in South Carolina. Barnes received a life sentence in Georgia for crimes related to running a prostitution ring separate from this murder. The Hunsbergers were both convicted of kidnapping in Georgia and received life sentences. Cave, Griffon, and Thatcher all pleaded guilty to aggravated assault in

it is my opinion that the court of appeals did not err in upholding the trial court's finding that the reasons given for the delay were reasonable. *See Pittman*, 373 S.C. at 552, 647 S.E.2d at 156–57 ("The record does not reflect any intentional or malicious delays by the prosecution, nor does the record reflect any negligent prosecutorial behavior in connection with this case. Additionally, the delays attributable to the defense were also reasonable in light of the circumstances of this case. Although it took a long time for the case to come to trial, any delay was the result of the complexities of this case. The justifications for the delay offered by both parties in this case weigh in favor of a finding that Appellant was not deprived of his right to a speedy trial.").

### C. Accused's Assertion of the Right to a Speedy Trial

Unlike the majority, I would find that Petitioner's assertion of his speedy trial right in November 2004 and January 2005 is not dispositive under the facts of this case. In response to Petitioner's assertion of the speedy trial right in conjunction with his motions for bail, Petitioner was granted relief under section 17-23-90 in the form of a personal recognizance bond. *See State v. Campbell*, 277 S.C. 408, 288 S.E.2d 395 (1982) (denying speedy trial claim where section 17-23-90 provides for release if not indicted and tried within a certain time frame, not dismissal of the charge). Petitioner did not again assert his speedy trial right until his trial in January 2012. At this point Petitioner had been prosecuted in Georgia and incarcerated there for seven years (from January 2005 until January 2012). In my opinion, Petitioner's failure to assert his right during this time period weighs against him. *See Waites*, 270 S.C. at 108, 240 S.E.2d at 653 (noting "the manner in which the defendant asserts his right [to a speedy trial] is an important factor to be considered" when analyzing whether a defendant speedy trial motion should be granted, and *Barker* "'emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.'" (quoting *Barker*, 407 U.S. at 532))); *State v. Foster*, 260 S.C. 511, 197 S.E.2d 280 (1973) ("The record offers no reason for the failure of the defendants to assert their right sooner, and under [*Barker*], a failure to assert the right will make it difficult for the defendants to prove that they were denied a speedy trial").[10]

---

Georgia and received eighteen-year sentences. Barnes and the Hunsbergers were then prosecuted in South Carolina.

[10] In my opinion, it can be inferred from the record that Petitioner did not, in fact, want a speedy trial. *See Barker*, 407 U.S. at 536 (stating, where the defendant did

Therefore, in my opinion the majority erroneously weighs this factor against the State.

### D. Prejudice

Petitioner argues that he was prejudiced by the passage of time because the witnesses' memories were impaired. The trial court found Petitioner's right to a fair trial was not impacted by the delay and therefore no prejudice resulted, in that every witness was still available to testify, the prior transcripts were available to Petitioner for impeachment purposes and to refresh the witnesses' recollections, and in fact Petitioner did "an effective job at pointing out to the witnesses in cross-examining them and impeaching them on prior inconsistent statements." Significantly, as noted by the court of appeals, Petitioner "did not allege any witnesses or evidence were lost, the delay impacted his case, or an earlier trial would have resulted in a different verdict and sentence." *See Hunsberger*, Op. No. 2014-UP-381. However, the majority asserts that the mere passage of time is enough to find prejudice in this case. I disagree. *See Pittman*, 373 S.C. at 551, 647 S.E.2d at 156 (rejecting Pittman's argument that a delay of three years, two months between arrest and trial was so lengthy that it was presumptively prejudicial); *Foster*, 260 S.C. at 515, 197 S.E.2d at 281 (finding a delay of more than five years was sufficient to require analysis of the other factors without finding presumptive prejudice).

This Court has noted that "the most serious interest to be protected by the guarantee to a speedy trial is the possibility of impairment of the defense." *Pittman*, 373 S.C. at 550, 647 S.E.2d at 155–56. In *Doggett*, the United States Supreme Court has also observed that:

---

not object to the Commonwealth of Kentucky seeking sixteen separate continuances in his trial date, "barring extraordinary circumstances, we [should] be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, *that the defendant did not want a speedy trial*." (emphasis added)). Petitioner testified that one of the reasons he did not want to be extradited to South Carolina was that he "needed to find out" how extradition would affect his Georgia appeal. In addition, the record indicates that the State was considering seeking the death penalty against Petitioner, which might explain Petitioner's failure to assert his speedy trial right during his Georgia incarceration.

> Unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence.

505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532). Under the circumstances of this case, where Petitioner was serving a life sentence in Georgia, it is my opinion that the pretrial incarceration and anxiety concerns were minimal.[11] Most, importantly, the delay did not in any way impair his defense. In fact, the delay may have worked to Petitioner's advantage. The Supreme Court has explained this paradox as follows:

> The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused. In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal

---

[11] In making this finding, the majority claims I ignore the Supreme Court's holding in *Smith v. Hooey*, 393 U.S. 374 (1969). There, the Supreme Court noted that incarceration in another jurisdiction "can have fully as depressive an effect upon a prisoner as upon a person who is at large." *Id.* at 378. In my opinion, this case is distinguishable. As one federal court has explained:

> *Smith* involved a prisoner who remained in federal custody for six years during which the State of Texas ignored his repeated requests to be brought to trial on an outstanding state charge. The Supreme Court there rejected the argument propounded by Texas that federalism concerns and respect for equal sovereigns barred it from seeking to try a defendant in federal custody even when that defendant vociferously and repeatedly requested to be tried as quickly as possible. Thus, the Supreme Court, as it made clear in *Barker*, attaches significant weight in the balance of interests that is dispositive of speedy trial claims to a defendant's assertion or failure to assert his speedy trial right with respect to an outstanding charge.

*United States v. Wade*, No. 08-CR-0120 LAK, 2015 WL 4475178, at *3 (S.D.N.Y. July 22, 2015) (footnotes omitted). Here, unlike in *Smith*, Petitioner never once asserted his speedy trial right while incarcerated in Georgia.

interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused . . . .

. . .

A second difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-in-crimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself.

*Barker*, 407 U.S. at 521.

I see two benefits accruing to Petitioner's defense as a result of the passage of time in this case. First, as the trial judge pointed out, Petitioner was able to cross-examine and impeach the witnesses using their prior testimony. Second, as the court of appeals pointed out, Petitioner "may have received a benefit as a result of the delay because the State ultimately decided not to pursue the death penalty against him." *State v. Hunsberger*, Op. No. 2014-UP-381; *see State v. Cooper*, 386 S.C. 210, 218, 687 S.E.2d 62, 67 (Ct. App. 2009) (noting because the State withdrew its notice to seek the death penalty, "the withdrawal could be construed as a benefit to Cooper resulting from the delay."). Because I cannot identify any prejudice befalling Petitioner as a result of the delay, I would find the trial court did not abuse its discretion when assessing this factor. *See Langford*, 400 S.C. at 445, 735 S.E.2d at 484 (finding a two-year delay in bringing the case to trial did not amount to a constitutional violation in the absence of any actual prejudice to the defendant's case); *State v. Brazell*, 325 S.C. 65, 76, 480 S.E.2d 64, 70–71 (1997) (noting the three-year-and-five-month delay was negated by the lack of prejudice to the defense); *Kennedy,* 339 S.C. at 251, 528 S.E.2d at 704 ("While Kennedy may have been slightly prejudiced by the twenty-six month pretrial incarceration, the more important question is whether he was prejudiced because the delay impaired his defense.").

### *III. Conclusion*

No single *Barker* factor is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." *Barker*, 407 U.S. at 533. Rather, the factors are interrelated and "must be considered along 'with such other circumstances as may be relevant.'" *Langford*, 400 S.C. at 441, 735 S.E.2d at 482 (quoting *Barker*, 407 U.S. at 533). Under this particular constellation of facts, I would hold that the trial court did not abuse its discretion in refusing to dismiss the charges against Petitioner, and consequently, the court of appeals did not err in upholding the trial court's finding that Petitioner's speedy trial right was not violated. Accordingly, I would dismiss the writ of certiorari as improvidently granted.

**KITTREDGE, J., concurs.**